**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**July 5, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

ROBERT H. MIRACLE,

        Plaintiff-Appellant,

v.

JO ANNE B. BARNHART,
Commissioner of Social Security
Administration,

        Defendant-Appellee.

No. 05-6308
(D.C. No. CIV-04-769-W)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **BRISCOE**, and **MURPHY**, Circuit Judges.

Robert H. Miracle appeals from an order of the district court affirming the

Commissioner's decision denying his application for Social Security disability

and Disabled Adult Child's benefits, which had a protective filing date of May 4,

---

[*]      After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

2001.[1] He alleged disability based on bipolar disorder with an onset date of April 1, 1999, when he was nineteen years old. An administrative law judge (ALJ) determined that he could return to his past relevant work as a stocker.

In this appeal, Mr. Miracle raises four issues. He argues that the ALJ failed to correctly assess the "longitudinal" nature of his mental impairment. He contends that there is substantial evidence to support his allegations of a disabling mental impairment. He argues that his mental impairment precludes him from performing his past relevant work. Finally, he contends that the district court improperly failed to make a de novo review of the magistrate judge's report and recommendation in his case. Because the ALJ failed to give proper consideration to all the evidence and the record and to make proper findings concerning the interaction between Mr. Miracle's RFC and his past relevant work, and because he inadequately developed the record concerning Mr. Miracle's impairments and his ability to return to his past relevant work, we must reverse and remand.

## FACTS

Mr. Miracle was born on September 14, 1979. On February 17, 1997, when he was seventeen, his mother brought Mr. Miracle to see his family doctor,

---

[1] Mr. Miracle applied for Disabled Adult Child's benefits based on the earnings record of his father, Roger Dale Miracle, who died fully insured on January 30, 2000. To obtain the benefits, Mr. Miracle needed to demonstrate, among other things, that he had a disability before attaining age 22 and that this disability continued without interruption through the date of his application. *See* 42 U.S.C. § 402(d).

Dr. Pope. Mr. Miracle reported having problems staying in school and had trouble "defining reality." Aplt. App. at 159. He had done drugs and engaged in binge drinking. He reported a fear that he might hurt somebody. Dr. Pope thought he showed "some almost delusional thinking at times with very decreased concentration" and that a "[p]ersonality disorder is probable." *Id.* at 158. Dr. Pope recommended that Mr. Miracle obtain psychological counseling.

By September 11, 1997, things were much worse. Mr. Miracle had dropped out of school, and was experiencing trouble sleeping. He had gained twenty-three pounds, had stopped seeing his friends, and hardly ever left the house. Dr. Pope observed that Mr. Miracle had "pressured speech, flight of ideas, and has a very low attention span" and that he "comes up with off the wall comments and completely changes the subject." *Id.* at 154. Mr. Miracle was hospitalized in mid-September 1997, at Bethany Pavilion Hospital at which time he was initially diagnosed with Psychosis, NOS (not otherwise specified), and later with paranoid schizophrenia. After his discharge from the hospital, he received follow-up treatment from a psychiatrist, Dr. McNeil, from September 25, 1997, to November 17, 2000. Dr. McNeil diagnosed him with schizoaffective disorder and treated him with a mood stabilizer and anti-psychotic medication.[2] The record

_____

[2] The ALJ found that Mr. Miracle has a "mental health impairment." Aplt. App. at 53. Mr. Miracle identified his condition as bipolar disorder on documents filed with the agency. *See, e.g., id.* at 116. The medical records contain many

(continued...)

does not contain any medical records from the 1997 hospitalization nor any treatment or progress notes from Mr. Miracle's three years of treatment with Dr. McNeil.[3] It does contain a letter from Dr. McNeil, dated January 7, 2002, summarizing his diagnosis and treatment of Mr. Miracle.

Records from the family doctor, Dr. Pope, during the period of October 31, 1997, to January 31, 2001, show sporadic visits for ear infections and hearing problems, with occasional notations that Mr. Miracle continued on his psychiatric medications. The next significant medical record pertaining to Mr. Miracle's mental status is dated April 2, 2001, six months after he stopped seeing Dr. McNeil and a month before he filed his application for benefits. Dr. Pope noted on that occasion:

> Patient comes in reporting he has been having some pain in his low back, thinks that he has had a kidney stone in the past, he reports it was "delirious pain." Patient reports he was screaming, he went outside to try and cool off, but took a blanket with no clothes. Patient reports also fever and chills. . . . He did have 2 beers yesterday. . . . As well he did some marijuana over the weekend. Denies any . . . suicidal/homicidal ideation. . . .
>
> Patient is unshowered, wearing polo shirt, briefs, and flip-flops. Patient very suggestable, having trouble continuing with individual topics. To grass is always greener on the other side of the fence he

---

[2](...continued)
different mental diagnoses, some of which note the existence of bipolar-type symptoms. Following his own assertions, we have referred to his condition generically as "bipolar disorder."

[3]     It appears that Mr. Miracle's representative attempted to obtain these records but was unable to do so. Aplt. App. at 131.

> wrote my grass is better. To every cloud has a s[il]ver lining he wrote clouds have lots of different linings. To people that live in glass houses should not throw stones he reports "lots of stones." Patient was completely oriented to date and time.

*Id.* at 144.

Dr. Pope diagnosed Mr. Miracle with a psychotic episode, talked to him about receiving inpatient treatment and to get back on his medications, and contacted the mental health authority in Norman, Oklahoma, and made arrangements for Mr. Miracle to go there that afternoon. There is nothing in the record to indicate whether Mr. Miracle kept his appointment with the mental health authority, or if so, what sort of diagnosis or treatment he received there.

The next evidence in the record concerning Mr. Miracle's mental health is a disability evaluation report conducted by agency consultant Dr. Chakraburtty three months later, on July 21, 2001. Dr. Chakraburtty noted that Mr. Miracle "reports that he is not having any psychiatric treatment at the present time." *Id.* at 163. He diagnosed him with "Psychosis, NOS," "History of Bipolar Disorder," and "Personality Disorder, NOS, with dependent traits." *Id.* at 165.

Less than a month later, in August 2001, Mr. Miracle obtained a comprehensive treatment plan and began receiving mental health services from Chisholm Trail Counseling Services. He was diagnosed at Chisholm Trail with

schizoaffective disorder, bipolar type.[4] It was noted that he was living with his mother.

The agency denied his applications initially and on reconsideration. On August 19, 2002, Mr. Miracle received a de novo hearing before an ALJ. The ALJ determined that Mr. Miracle had severe impairments, namely "mental health impairment and some hearing difficulty." Aplt. App. at 53. He further determined that Mr. Miracle retained the residual functional capacity (RFC) to perform "the physical demands of a full range of physical activities. However, he should not be expected to understand, remember, and carry out detailed or complex job instructions; work closely with the general public; or perform tasks requiring ability to hear with the left ear." *Id.* at 56.

---

[4] The Chisholm Trail records before the ALJ covered the period from August 7, 2001, through February 6, 2002. *See* Aplt. App. at 206-47. Curiously, in his brief, Mr. Miracle also cites to Chisholm Trail records from May 29, 2002, through July 26, 2003. He even supplies a purported record reference to these documents. *See* Aplt. Br. at 22-23 (citing Aplt. App. at 211-47). These medical records are not contained in either copy of the appendix filed with this court, however. Neither, it appears, were they before the ALJ or the Appeals Council.

The ALJ apparently received exhibits at the hearing, including exhibits 5F and 6F, records provided by Chisholm Trail on February 13, 2002, covering the time period we have noted, but nothing later than this. *See* Aplt. App. at 34, 247, 265. The ALJ did not hold the record open, *see id.* at 266, 275, and nothing in the record indicates that Mr. Miracle attempted to supplement the record before the Appeals Council with anything but a brief, *id.* at 36. We conclude that the records cited on pages 22 and 23 of Mr. Miracle's brief are not part of the record on appeal, and we will not consider them.

**STANDARD OF REVIEW**

The ALJ found that Mr. Miracle could return to his past relevant work as a stocker, and was therefore not disabled. *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (outlining five-step test for disability). The Appeals Council denied review, making the ALJ's decision the Commissioner's final decision. We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *See Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fowler v. Bowen*, 876 F.2d 1451, 1453 (10th Cir. 1989) (quotations omitted).

**ANALYSIS**

**1. Failure to develop the record**

The Commissioner follows a five-step sequential evaluation process to determine whether a claimant is disabled. *See Williams*, 844 F.2d at 750-52. The ALJ decided this case at step four, finding that Mr. Miracle could return to his past relevant work. The claimant bears the burden of establishing a prima facie case of disability at steps one through four. *See id.* at 751 n.2.

Although Mr. Miracle bore the burden of establishing his disability, "unlike the typical judicial proceeding, a social security disability hearing is

nonadversarial, with the ALJ responsible in every case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997) (citation and quotation omitted). The duty is particularly acute where the claimant is unrepresented at the hearing, *Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 361 (10th Cir. 1993), or (as here) is represented by a non-attorney. In addition to developing the record at the hearing through careful questioning, and by obtaining the services of a consultative examiner when necessary, the ALJ "has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing." *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996).

The most striking thing about the administrative record is the absence of known medical records directly relevant to significant issues surrounding Mr. Miracle's mental disability. As noted, the record does not contain any medical records from his 1997 hospitalization at Bethany Pavilion Psychiatric Hospital nor any treatment or progress notes from Mr. Miracle's three years of treatment with Dr. McNeil, from 1997 to 2000. Records also appear to be missing from any follow-up treatment he obtained through a hospitalization recommended by his family doctor after a psychotic episode in April 2001. The government contends that Mr. Miracle waived any objection as to this woefully under-developed state of the record by failing to raise this issue in

district court until he filed his objections to the magistrate judge's report and recommendation. These vast gaps in the record, however, are directly relevant to the other issues that he did properly preserve, and cannot be simply swept under the rug by a narrow application of the waiver rule.

### 2. "Longitudinal nature" of mental impairment

The ALJ made only passing reference to the three years of mental health treatment Mr. Miracle received from Dr. McNeil prior to the time he applied for benefits. While an ALJ need not discuss every piece of evidence in the record, the ALJ appears to have affirmatively and selectively misread the record concerning Mr. Miracle's impairment. At several times in his decision, the ALJ relied on the fact that Mr. Miracle was not receiving mental health care *at the time he filed his application for benefits*. *See* Aplt. App. at 53 ("After filing his applications for benefits, the claimant sought mental health counseling. . . . Although the claimant obtained psychological counseling after filing for benefits, he was not receiving mental health care as of the time of his application."); *id*. at 55 ("The claimant testified . . . that he had recently started mental health treatment . . . ."). This reading of the record, which ignored Mr. Miracle's long-standing treatment history, reflected the kind of misleading selective inquiry courts have decried on numerous occasions. *See, e.g., Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 743 (10th Cir. 1993). Moreover, the ALJ's failure to develop the record by obtaining the records pertaining to this

treatment facilitated his failure to consider the medical evidence showing a long-standing record of impairment.

### 3. Nature of impairment and past relevant work

A key issue in this case involved whether Mr. Miracle was capable of sustained work, given his spotty employment record and his frequent job changes, many of which were attributed by himself and his treating physician to his mental impairment. A disability report prepared by his representative informed the ALJ that, "Robert has had frequent job changes due to an inability to stay focused, complete tasks, Has been fired, has had trouble relating to others at work, and has had to quit because of too much pressure at work." Aplt. App. at 116. Dr. McNeil explained that Mr. Miracle "had several different jobs, all of which he had quit for various reasons. What seemed to be clear from his reports is that he had difficulties with interpersonal relations, both with co-workers and in service related jobs." *Id.* at 167. The VE testified that his work record was quite "scant" and that it "seem[ed] like work attempts to me." *Id.* at 272.

Even if we assume that Mr. Miracle's previous work attempts, only a few of which lasted more than a month, represented "past relevant work," *see* 20 C.F.R. § 404.1560(b)(1) (defining past relevant work), given the issues developed prior to the hearing, the ALJ needed to build an adequate record and make proper findings concerning Mr. Miracle's ability to work with others on a sustained basis, and the demands of his past relevant work in terms of relating to

co-workers and the general public. *See* SSR 96-8p, 1996 WL 374184, at *5 (stating that ALJ must consider work attempts and lay evidence in determining RFC).

Mr. Miracle's representative asked him one question about the problems he had had with employment. He responded that he had experienced the "[f]eeling of being paranoid, like people were out to get me, and like somebody was going to do something bad to me." *Id.* at 267. He stated, "I couldn't work right because I thought I would hear things that weren't present to others." *Id.* Mr. Miracle further testified that he did not have any friends and did not do things with people outside his family. *Id.* at 269. The ALJ only asked Mr. Miracle one question at the hearing, concerning whether he had obtained a GED.

The ALJ asked the VE about the specific tasks involved in being a stocker, the kind of work Mr. Miracle had previously performed. While he asked whether the jobs would require significant interaction with the general public (to which the VE responded no), he did not ask any questions concerning what sort of interaction was required with Mr. Miracle's co-workers. As mentioned, Dr. McNeil stated that Mr. Miracle had quit many of his prior jobs and had "difficulties with interpersonal relations, *both with co-workers* and with customers in service related jobs." *Id.* at 167 (emphasis added). He also opined that "[d]uring the time that I treated [Mr. Miracle], he consistently showed mental

status signs and symptoms which would make employment difficult in . . . jobs which require significant amounts of interpersonal contact." *Id.* at 168.

Dr. McNeil did not distinguish between difficulties Mr. Miracle would experience in dealing with co-workers and with the general public. The ALJ concluded in his decision, however, giving no reason for ignoring Dr. McNeil's opinion concerning jobs involving interpersonal contact, that Mr. Miracle "is able to interact appropriately with others on a superficial level [but] . . . should not be expected to . . . work closely with the general public." *Id.* at 55. As noted, there was no testimony about the demands of Mr. Miracle's past relevant work when it came to relating to his co-workers. Moreover, the ALJ asked the VE only one hypothetical question, concerning Mr. Miracle's ability to perform work activities, and that question contained no indication of any interpersonal difficulties, either with the public or with co-workers. Aplt. App. at 274-75.[5] "[T]estimony elicited by hypothetical questions that do not relate with precision

---

[5]     The ALJ asked:

> Now let's assume I have an individual that could work but that – and taking only the jobs that he's had in the past, I'm not looking at anything else at the present time. Let's assume I had an individual that could work, but let's assume also that he would – and let's assume he would be a very good employee, but he's going to have to have more time off than the average employee would have to have. At what point in time would he no longer have a job?

Aplt. App. at 274-75.

-12-

all of a claimant's impairments cannot constitute substantial evidence to support the [Commissioner's] decision." *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (first alteration in original).  We conclude that the ALJ failed to follow the appropriate legal standards in reaching his conclusions about Mr. Miracle's ability to work and his past relevant work, and failed to adequately develop the record concerning these issues.

**4.  De novo review of magistrate judge's recommendation**

As we are reversing the district court's decision affirming the agency's determination, it is unnecessary to determine whether the district court properly reviewed the magistrate judge's report and recommendation.

This case is REVERSED and REMANDED to the district court, with instructions to remand to the agency for further proceedings in accordance with this order and judgment.

Entered for the Court


Robert H. Henry
Circuit Judge